UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════

THOMAS BURKE, RICHARD DANITZ,
ROBERT J. KULCZYK, JAMES M. KILGER,
BRUCE HOFFMAN, GEORGE FERRARO,
JAMES BIDDLE, SR., AND JOHN O'HARE, JR.
 as TRUSTEES on behalf of the Buffalo
Carpenters Pension Fund, and the
BUFFALO CARPENTERS PENSION FUND

                          Plaintiffs,

                                                    DECISION AND ORDER
          v.                                             02-CV-519

HAMILTON EQUIPMENT INSTALLERS, INC.,
PROFESSIONAL FURNISHINGS &
EQUIPMENT, INC.,
A. JAN STALKER ASSOCIATES, INC., AND
HAMILTON INSTALLERS, INC.

                          Defendants.

═══════════════════════════════════


## INTRODUCTION

          Plaintiffs, the Buffalo Carpenters Pension Fund ("Fund") and individual

trustees of the Fund (collectively "Trustees"), commenced this action pursuant to the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461,

seeking to collect withdrawal liability from the defendants, Hamilton Installers, Inc.

("Installers"), Hamilton Equipment Installers, Inc. ("Equipment"), A. Jan Stalker

Associates, Inc. ("Stalker Associates") and Professional Furnishings and Equipment,

Inc. ("Professional").  Plaintiffs allege that defendant Installers is liable for pension

contributions arising from a collective bargaining agreement between Installers and the

Buffalo District Council of Carpenters Union ("Union").  Plaintiffs allege that defendants Stalker Associates, Equipment and Professional are liable for Installers' withdrawal liability because they were under "common control" with Installers or, alternatively, that they are "alter egos" of Installers.

Installers and Stalker Associates failed to answer the complaint.  On January 11, 2005, this Court granted the plaintiffs' motion for default judgment against Installers and Stalker Associates.  See Dkt. No. 65.

Equipment and Professional did answer the complaint and challenged the plaintiffs' theories of liability.  The parties cross-moved for summary judgment.  The Court granted summary judgment to defendants on plaintiffs' claims that Equipment and Professional were under "common control" with Installers, but denied summary judgment on the issue of whether Equipment or Professional were alter egos of Installers.

A bench trial was held on March 22 and 23, 2005.  The parties filed proposed findings of fact and conclusions of law and in July 2005 the Court held oral argument.  The following constitutes the Court's proposed findings of fact and conclusions of law pursuant to Fed. R. Civ. P.  52(a).

## **FINDINGS OF FACT**

### A.   **Installers - Formed 1964 - Dissolved 1994**

Installers was formed in 1964 by Alfred Jan Stalker ("Jan Stalker").  Tr.[1] at

---

[1]  "Tr." refers to the transcript of the bench trial.

244-45.  Jan Stalker owned 52 percent of Installers, another individual named Donald

O'Connor owned the remaining 48 percent of Installers.  Tr. at 248-49.  Jan Stalker had

another business, Stalker Associates, which he incorporated in 1968.  Stalker

Associates was in the business of selling furniture to laboratories, libraries, schools and

hospitals.  Tr. at 243-44.  Installers performed the installation work for sales made by

Stalker Associates.  Tr. at 88.  Jan Stalker bid for jobs for both product and installation.

He hired workers through Installers to do the installation work.[2]  Id.

In 1982, Jan Stalker hired his daughter, Tracie Stalker ("Tracie"), to work

at Stalker Associates.  Although Tracie was employed by Stalker Associates, she

maintained the books and performed all of the administrative work for Installers.  Tr. at

85-86.  Installers did not have any assets or officers.  Tr. at 86, 98.  Its only customer

was Stalker Associates.  Tr. at 88.

In December 1992, Installers entered into a collective bargaining

agreement with the Union, pursuant to which it agreed to make pension contributions to

the Fund on behalf of Union employees.  The collective bargaining agreement was

effective from May 1993 to May 1996. See Pl. Ex. 1.  Tr. at 30-31.  Installers made

contributions to the Fund from 1990 to 1993.[3]  See Pl. Ex. 2.  Installers hired its last

laborer and made its last contribution to the Fund in November 1993, see Pl. Ex. 2, and

---

[2]  On occasion, Jan Stalker would hire another company to perform the installation work. Tr. at 288.

[3]  It is not clear when the first collective bargaining agreement between Installers and the Union was signed.  It appears that there must have been an earlier agreement because Installers began contributing to the Fund in 1990, which was before the 1993-1996 collective bargaining agreement was in effect.  In any event, that issue is not material to the Court's determination of liability.

ceased doing business in 1994.  Tr. at 95-96.  When it closed its doors in 1994,

Installers had no assets, and had a balance of $17,500, which was transferred from

Installers to Stalker Associates on the last day of Installers' fiscal year.  See Tr. at 309.


**B.     Equipment - Formed December 1993**

In December 1993, Jan Stalker incorporated a new

entity–Equipment–which he co-owned with Tracie.  See Pl. Ex. 15.  Shortly after

Installers ceased doing business, Equipment began doing all of the installation work for

Stalker Associates.[4]  In other words, Equipment replaced Installers as the entity

performing the installation for Stalker Associates.  There was one important difference

however–Equipment hired primarily non-union workers,[5] whereas Installers had hired

union workers.

Jan Stalker testified that he decided to dissolve Installers based upon

discussions with his accountant, Anthony Cardarelli, who had expressed concerns

about O'Connor's minority interest in the company.  O'Connor had left Installers in the

early 1970s and had not been heard from since.  Tr. at 250.  Nevertheless, he still

owned 48 percent of Installers.  Cardarelli had expressed concerns that the absence of

a minority shareholder could create liability problems.

Tracie testified that Equipment was formed, in part, to avoid Installers'

---

[4]  Equipment's first job was in early 1994.  See Tr. at 104.

[5]  Equipment did employ one or two union members in connection with a handful of
other jobs.  See Tr. at 108-09; 114.  Barring those exceptions, however, Equipment primarily
hired non-union workers.

4

obligations under the collective bargaining agreement.  See Tr. at 100-02.[6]  The Court

found this testimony to be credible and supported by other evidence.  Most notably,

after Equipment was formed and replaced Installers as the entity doing installation work

for Stalker Associates, Equipment hired primarily non-union workers and (with one

exception)[7] no further contributions were made to the Fund.  Although the existence of

a missing shareholder also may have factored into Jan Stalker's decision to dissolve

Installers and become a co-owner of Equipment, the Court finds that this change was

also motivated, in large part, by an intent to avoid Installers' obligations under the

collective bargaining agreement.

After it was formed, Equipment shared an office and telephone with

Stalker Associates, just as Installers had done while it was in existence.  See Def. Exs.

9, 19, 47; Pl. Exs. 2, 3 and 38.  Tracie continued to be employed by Stalker Associates,

but maintained the books and performed all of the administrative duties for Equipment,

just as she had done for Installers.  Tr. at 81, 84.


**C.     Professional - Formed December 1996**

In December 1996, Tracie's brother, Gregg Stalker ("Gregg") formed

Professional.  Gregg is the president and sole owner of Professional and an employee

---

[6]  When asked by counsel why she formed Equipment, Tracie responded "[I]t was
another way to have labor people without using the union, try to be more economical, I
suppose."  Tr. at 100.  She went on to acknowledge that Equipment would not have to make
pension contributions if non-union workers were hired, and that Equipment could hire non-union
workers because it was not a signatory to the collective bargaining agreement.  Tr. at 101.

[7]  On one occasion in December 1995, Equipment contributed to the Fund on behalf of
two Union members.  See Pl. Ex. 3.  Tracie testified that this contribution was erroneously
made.

5

of the company.  Tr. at 194.  His wife is the treasurer.  Tr. at 194-95.  Before starting his

own company, Gregg worked as a sales representative for his father at Stalker

Associates for about ten years.  Tr. at 195.

Professional's first year of doing business was in 1997.  Tr. at 196, 199.

During the first year, Gregg operated Professional out of his home.  Tr. at 225.  In

March 1998, he relocated to 1291 George Urban Boulevard, Depew, New York.

Like Stalker Associates, Professional is in the business of selling furniture

and equipment to laboratories, libraries, schools and hospitals.  Tr. at 201-02.

Professional supplies and installs furniture and equipment to various clients.  For

example, it may purchase auditorium seating from the manufacturer and sell it to a

school at a mark up.  Tr. at 202.  The mark up also includes the cost of installation.

However, like Stalker Associates, Professional does not perform any of the installation

work itself.  Instead, it "subcontracts" the installation work through Equipment or other

installation companies.  Tr. at 211-212, 223-24.  In other words, Professional hires

Equipment workers (or sometimes other companies) to perform the installation work.

Gregg testified that the reason for doing so was to insulate it from the liabilities of its

subcontractors, including Equipment.  Tr. at 211-12.  At the time that Gregg formed

Professional, he was unaware of plaintiffs' claim for withdrawal liability.  Tr. at 224.

In 1997 and 1998, Professional and Stalker Associates were both in

existence and, on occasion, would compete with one another for business.  Tr. at 291-

92.  Sometime in 1998, Jan Stalker decided to retire and wind down the affairs of

Stalker Associates.  Tr. at 258.  He stopped bidding on jobs and completed only small

jobs for existing customers.  At the time that this occurred, Jan Stalker was unaware of

6

the plaintiffs' claim for withdrawal liability.

When Professional first started doing business in 1997, Tracie was still employed by Stalker Associates and was running Equipment out of Stalker Associates' offices, as she had been since Equipment was formed in December 1993.  After 1997, Equipment no longer received any work from Stalker Associates.  Instead, beginning in 1998 and thereafter, Equipment worked exclusively for Professional.  Also in 1998, Tracie stopped working for Stalker Associates and became an employee of Professional.  Tr. at 82.  In March of that same year, she relocated  Equipment from Stalker Associate's office to Professional's office at 2191 George Urban Boulevard, Depew, New York.  Tr. at 118.

**D.    The Fund**

The Fund is a multiemployer pension fund governed by ERISA, as amended by the Mulitemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 et. seq.  The Fund has approximately 1,600 plan participants.  Tr. at 38. Sometime in 1999 or 2000, Trustees of the Fund discovered that it was significantly underfunded – by approximately $80 million.  To address this crisis, the then-current employers agreed, with the approval of  the Pension Guarantee Benefit Corporation, to a mass withdrawal from the Fund.  Pursuant to this agreed-upon mass withdrawal, the Fund closed in January 2002.  Tr. at 53.

As to employers who were not part of this mass withdrawal, it was agreed that the Fund would pursue withdrawal liability against them under ERISA.  Tr. at 54. Withdrawal liability was assessed against Installers in the amount of $81,173.00.  Pl.

7

Ex. 6.  In June 2001, the Fund sent Installers a letter advising it of the withdrawal

liability assessment.  The letter was mailed to Installers at 1216 Maple Road,

Williamsville, New York, 14221, but returned as undeliverable with a note (presumably

from the Postal Service) suggesting that the plaintiffs try a different address: 1291

George Urban Blvd., Depew, New York.  See Pl. Ex. 5.  In November 2001, the Fund

sent a demand letter to Installers at the Depew address, but received no response.[8]  In

March 2002, the Fund sent a second letter.  See Pl. Ex. 8.  The second letter advised

Installers that it would be in default if it did not begin making withdrawal liability

payments within 60 days.  Id.  Postal Service records reflect that acceptance of the

letter was refused.  See Pl. Ex. 9.

No payments were received within that time period.  Accordingly, in July

2002, the Fund commenced this action seeking to recover the full amount of withdrawal

liability from the defendants.

## DISCUSSION

### I.   Statutory Framework for Withdrawal Liability

Withdrawal liability is part of a comprehensive legislative scheme

designed to address the adverse consequences that arise when individual employers

terminate their participation in, or withdraw from, multiemployer pension plans.

"Congress determined that unregulated withdrawals from multiemployer pension plans

could endanger their financial vitality and deprive workers of . . . vested [pension] rights

---

[8]  The letter was signed for by Tracie Stalker.  See Pl. Ex. 7.

. . . ."  See Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 227-28 (1986).

Accordingly, Congress imposed a withdrawal liability scheme, pursuant to which

employers withdrawing from a multiemployer pension plan are required to pay their

proportionate share of the plan's "unfunded vested benefits" calculated as the

difference between the present value of the vested benefits and the current value of the

plan's assets. Id. at 217; see also 29 U.S.C. §§ 1381, 1383(a).  Following withdrawal

from a plan, the fund is vested with authority to determine the amount of withdrawal

liability.  It must then notify the withdrawing employer of its withdrawal liability, set a

payment schedule, and formally demand payment.  Id. at §§ 1382, 1399.  Within 90

days of receiving the notice, the employer may request a review of the determination of

liability.  Either side may thereafter initiate arbitration proceedings within 60 days of the

earlier of: (1) the date on which the employer was notified of the sponsor's withdrawal

liability determination and demand for payment, or (2) 120 days after the date of the

employer's request for review.  Id. § 1401(a)(1).  Should the employer fail to request

arbitration within the statutory time periods, the amount of withdrawal liability assessed

by the plan sponsor in the notice becomes due and owing.  Id. § 1401(b)(1).

Withdrawal liability seeks to "avoid a situation in which the financial

burden of funding vested pension benefits is shifted onto other employers participating

in the multiemployer pension plan and ultimately, to the Pension Benefit Guaranty

Corporation."  Transpersonnel, Inc. v. Roadway Express, Inc., 422 F.3d 456, 460 (7th

Cir. 2005).  However, withdrawal liability is imposed only upon an "employer" who

withdraws from a plan.  See 29 U.S.C. § 1381(a)("If an *employer* withdraws from a

multiemployer plan . . . then the *employer* is liable to the plan in the amount determined

9

under this part to be the withdrawal liability.") (emphasis added).

In this case, there is no dispute that Installers, as signatory to the CBA, was an "employer" under ERISA and incurred withdrawal liability to the Fund in the amount of $81,173.00.  Indeed, as noted above, the Court has already granted default judgment in favor of plaintiffs against Installers for its proportionate share of withdrawal liability.[9]  However, as Installers was dissolved over ten years ago, plaintiffs presumably are unable to collect their default judgment against Installers and seek to hold the remaining defendants liable under equitable principles of piercing the corporate veil.

## II.   Alter Ego Theory of Liability

Plaintiffs argue that withdrawal liability should be imposed upon Equipment, even though it is not a signatory to the collective bargaining agreement with the Union, because it is an "alter ego" of Installers, the actual signatory.  The alter ego theory of liability permits a court to disregard the corporate form and impose liability upon a nonsignatory of a collective bargaining agreement where the nonsignatory is merely an "alter ego" of the signatory.  If two companies are deemed "alter egos" of each other, then each is bound by the collective bargaining agreements signed by the other.  See Lihli Fashons Corp., Inc. v. N.L.R.B., 80 F.3d 743, 748 (2d Cir. 1996).

"[A]lter-ego liability does not arise from any particular statutory provision at all, but rather from a general federal policy of piercing the corporate veil when necessary to protect employee benefits."  See New York Sate Teamsters Conference

_____

[9]      Default judgment was also entered against Stalker Associates.

Pension & Retirement Fund v. Express Services, Inc., 426 F.3d 640, 647 (2d Cir. 2005).

Although developed in the labor law context, alter ego liability has been applied to

claims involving employee benefit funds brought under ERISA.  See, e.g., Mass.

Carpenters Central Collection Agency v. Belmont Concrete Corp., 139 F.3d 304, 305-

06 (1st Cir. 1998).  "The rationale is that 'an employer who evades his pension

responsibilities gains an unearned advantage in his labor activities.  Moreover,

underlying congressional policy behind ERISA clearly favors the disregard of the

corporate entity in cases where employees are denied their pension benefits.'"  Id. at

308 (quoting Chicago Dist. Council of Carpenters Pension Fund v. P.M.Q.T., Inc., 169

F.R.D. 336, 342 (N.D. Ill. 1996)).

          The issue of whether an entity is an "alter ego" of a signatory is a factual

question to be decided the Court, not an arbitrator.  See Express Services, 426 F.3d at

645-47; see also LaBarbera v. C. Volante Corp., 164 F. Supp. 2d 321, 327 (E.D.N.Y.

2001) ("Whether companies are alter egos is a question of fact.").

          In determining whether an entity is an alter ego of another, the Court

should look to whether the two enterprises have substantially identical management,

business purposes, operation, equipment, customers, supervision, and ownership.  See

Lihli Fashions, 80 F.3d at 748; LaBarbera, 164 F. Supp. 2d at 327.  Evidence of an anti-

union animus is also relevant, although not essential.  See Goodman Piping Products v.

N.L.R.B., 741 F.2d 10, 12 (2d Cir. 1984); LaBarbera, 164 F. Supp. 2d at 327.  "'The

focus of the alter ego doctrine . . . is on the existence of a disguised continuance or an

[employer's] attempt to avoid the obligations of a collective bargaining agreement

through a sham transaction or technical change in operations.'"  Newspaper Guild of

New York, Local No. 3 v. N.L.R.B., 261 F.3d 291, 298 (2d Cir. 2001) (quoting Lihli Fashions, 80 F.3d at 748).

### III.   Equipment is the Alter Ego of Installers

Upon consideration of the relevant factors, the Court finds that Equipment is an alter ego of Installers.  Equipment and Installers had substantially identical management, business purpose and operation.  Both companies were managed by Tracie Stalker.  Both entities provided the vehicle through which Stalker Associates hired workers to perform installation work.  While Installers was in business, Stalker Associates was its only customer.  After Installers was dissolved, Equipment replaced it as the vehicle through which Stalker Associates obtained its labor.  Like Installers, Stalker Associates was Equipment's only customer, at least until 1998, when Stalker Associates went out of business.

Both entities (Installers and Equipment) were operated out of the address of Stalker Associates until Stalker Associates went out of business in 1998.  Tracie managed both companies in the same manner.  Neither entity was operated for profit, had any assets, computers or equipment.  The sole function of each company was to provide labor for the installation of products sold by Stalker Associates.[10]  When Installers was in business and Stalker Associates needed to install its product, it would hire its workers through Installers.  Installers would then send  Stalker Associates a bill

---

[10]     Of course, once Stalker Associates went out of business, Equipment's sole function shifted from providing installation work to Stalker Associates to providing installation work for Professional.

to cover the cost of that labor and any minor overhead, such as insurance.  Tr. at 89.

Installers did not exist independently of Stalker Associates–its sole purpose was to

provide labor for the benefit of Stalker Associates.

Likewise, Equipment's sole function, at least until 1998,  was to provide

installation work for Stalker Associates.  After Equipment was formed, Stalker

Associates ceased "subcontracting" through Installers and begin obtaining its labor

work through Equipment.  When Stalker Associates needed to install its product, it hired

its workers through Equipment, just as it had previously done through Installers.

Equipment would then bill Stalker Associates for the cost of the labor and any minor

overhead.  Like Installers, Equipment made little or no profit.

While the ownership of the two companies differed somewhat, that factor

does not undermine the Court's determination of alter ego status.  Installers was owned

by Jan Stalker and an absent shareholder, Donald O'Connor.  Because the only other

shareholder was absent (and had been for almost 20 years), it is clear that Installers

was being run by Jan Stalker, for the benefit of his other company, Stalker Associates,

and with the assistance of his daughter, Tracie.  Equipment, on the other hand, was

owned by Tracie and Jan Stalker, with Tracie being the majority shareholder.

Nevertheless, like Installers, Equipment was being run for the benefit of Stalker

Associates, with the assistance of Tracie.

Equipment rarely observed corporate formalities.  Documentation for only

two shareholder meetings was provided.  Tr. at 118.  Tracie believed that more

meetings may have occurred, but testified that they were "very informal" and "never

documented."  Tr. at 116-17.  It is clear that while Stalker Associates was in existence,

Tracie was running Equipment in the same manner and for the same purpose as her father had run Installers.  Even though Tracie occupied the majority shareholder position in Equipment, she received no salary or income from Equipment.  Instead, she was being paid by her father's company, Stalker Associates.  Given the financial realities, it is unlikely that Tracie exercised corporate judgment independent of her father, the minority shareholder.

The timing of Equipment's formation and the reason for forming Equipment further bolster this Court's conclusion that Equipment was an alter ego of Installers.  Installers was formed in 1968.  From 1968 to 1993, it provided installation work for Stalker Associates.  In fiscal year 1992-93, Installers performed over $57,000 in installation work for Stalker Associates.  The following year, 1993-94, Installers performed over $107,000 in installation work for Stalker Associates  See Def. Exs. 5, 7. Equipment was formed in 1993, and began doing business in 1994.  Shortly thereafter, Installers ceased performing all business for Stalker Associates.  In fiscal year 1994-95, Equipment performed $5,373 in installation work for Stalker Associates.  See Def. Ex. 48.  Installers did none.  See Def. Ex. 9.  The following year, 1995-1996, Equipment performed over $143,000 in installation work for Stalker Associates, whereas Installers did none.  See Def. Exs. 10, 49.  The following year, 1996-1997, Equipment performed over $191,000 in installation for Stalker Associates, whereas Installers did none. Indeed, Installers performed no work after 1994, Tr. at 95, the year that Equipment began doing business.  There can be no doubt that Equipment replaced Installers.

Equipment was formed in the same year that the most recent collective bargaining agreement was signed.  As noted above, it is the Court's finding that

Equipment was formed, in part, to avoid Installer's obligation under the collective bargaining agreement.  Defendants correctly point out that there is no evidence that Equipment was formed to avoid Installers' potential withdrawal liability because, at that time, neither Jan Stalker or Tracie was aware of plaintiffs' claim for withdrawal liability. Indeed, they did not even learn about plaintiffs' withdrawal liability claim until several years after Installers was dissolved.  Nevertheless, where as here there is evidence that a successor was formed with the intent to avoid obligations under the collective bargaining agreement, it is not necessary for the plaintiffs to prove that the defendants had specific obligations under the collective bargaining agreement in mind.  Rather, evidence of a general anti-union animus is a factor weighing in favor of finding alter ego status.  See Goodman Piping, 741 F.2d at 12.

In sum, upon consideration of the relevant factors, the Court finds that Equipment was simply a "disguised continuance" of Installers, and was formed in part to "avoid [Installers] obligations [under] a collective bargaining agreement through a sham transaction or technical change in operations.'" Newspaper Guild, 261 F.3d at 298 (quotation omitted).  As such, this Court finds that the alter ego theory of liability applies to render Equipment liable for the withdrawal liability obligations of its predecessor, Installers.

## IV.    Professional's Liability for Equipment's Debts

Plaintiffs also seek to hold Professional liable for the withdrawal liability of Installers.  In their Amended Complaint, plaintiffs alleged that Professional was an alter ego of Installers and Stalker Associates.  See Amended Compl., Doc. No. 19, at ¶ 13.

15

Plaintiffs have since abandoned that argument, and now concede that Professional was not an alter ego of either Installers or Stalker Associates.

Plaintiffs also concede that Professional is not an alter ego of Equipment under ERISA's alter ego doctrine.  See Pl. Reply Post Trial Brief, Dkt. 81, at 10 ("The alter ego doctrine of Lihli Fashions. . . is inapplicable to the question of whether Professional is liable for the obligations of . . . Equipment . . . .").  They correctly note that ERISA's alter ego doctrine of liability is inapplicable where, as here, the two entities (Professional and Equipment) exist simultaneously.  Id.

Consideration of the other Lihli Fashions factors bolsters the conclusion that Professional is not an alter ego of Equipment.  Equipment and Professional do not have substantially identical management, business purpose, operation, customers or ownership. Professional is wholly owned by one shareholder–Gregg Stalker, whereas Equipment is owned by Tracie and Jan Stalker.[11]  Tracie runs Equipment, Gregg runs Professional.  Professional is in the business of selling furniture and equipment to schools, libraries, hospitals, and laboratories.  Equipment merely acts as a "subcontractor" for Professional, providing labor for *some* of Professional's installation work.  Before Professional was formed in 1996, Equipment acted exclusively as a subcontracting entity for Stalker Associates.  It was only after Stalker Associates ceased doing business that Equipment began working exclusively for Professional.  Clearly, Professional is not an alter ego of Equipment under ERISA's alter ego analysis.

Recognizing that the federal labor law of alter ego liability affords no relief,

---

[11]     At some point, Jan Stalker transferred his shares in Equipment to Tracie, leaving her as its only shareholder.

plaintiffs ask this Court to disregard the corporate form and hold Professional liable for Equipment's debts.  They cite <u>Lowen v. Tower Asset Mgmt., Inc.</u>, 829 F.2d 1209 (2d Cir. 1987), in support of their position.  In <u>Lowen</u>, the Second Circuit held that individual corporate officers of a fiduciary to a pension plan could be held jointly and severally liable for losses incurred as a result of a breach of the fiduciary's obligations.  The Court held that evidence that the officers acted in concert with the fiduciary in breaching its obligations under ERISA justified disregarding the corporate form and holding the individual shareholders liable.

<u>Lowen</u> is readily distinguishable from this case.  The evidence presented in <u>Lowen</u> demonstrated that the corporate officers *directly participated* in the unlawful conduct by "act[ing] in concert with [the fiduciary] in causing the prohibited transactions."  <u>Id.</u> at 1220.  The Court held that a party who "knowingly participat[es] in fiduciary breaches may be liable under ERISA to the same extent as the fiduciary."  <u>Id.</u>

This case does not involve knowing breaches of fiduciary obligations under ERISA.  It involves the question of whether an entity who is neither a signatory to a collective bargaining agreement, nor an alter ego of the signatory, can be held liable for the signatory's withdrawal liability contributions.  Moreover, unlike <u>Lowen</u>, there is no evidence in this case that Professional engaged in fraudulent conduct with regard to the withdrawal liability obligations.  To the extent there was any wrongdoing, it occurred when Equipment was formed in an effort to evade Installer's obligations under the collective bargaining agreement.  At that time, Professional did not even exist. Professional was not incorporated until about three years later.  Nor is there any indication that Gregg, Professional's sole shareholder, played any role in the formation

17

of Equipment.  As far as the Court can tell, Professional never even employed any of

the union members on whose behalf the pension contributions are sought.

　　　　　The fact that Professional may have benefitted from doing business with

the alter ego of a signatory–years after the alter ego was formed–does not provide any

basis for this Court to impose liability upon it for unpaid ERISA contributions that arose

long before the two entities began doing business.[12]  Plaintiffs state that Equipment was

being run intentionally without a profit.  However, that was the case even before

Professional came into existence.  In contrast to Lowen, the Court finds no evidence

that Professional did anything wrongful so as to justify holding it liable for Equipment's

debts.

　　　　　Alternatively, plaintiffs ask this Court to look to New York state law of

corporate veil-piercing as a guide to determine whether liability should be imposed upon

Professional.  Stated differently, plaintiffs argue that even though Professional is not an

alter ego of Equipment under ERISA's law of corporate veil-piercing, they argue that

this Court should apply New York state law of veil-piercing to hold Professional liable for

Equipment's debts.

　　　　　Under New York state law, a judgment creditor, under certain

circumstances, may be entitled to pierce the corporate veil of an insolvent defendant to

recover its judgment from a controlling shareholder or corporation.  For example, in

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131 (2d

---

[12]　　　　The Court recognizes that, by the time withdrawal liability was *assessed* in 2001,
Equipment and Professional were sharing the same address and doing business together.
However, the withdrawal liability obligation *arose* under a collective bargaining agreement that
expired before Professional was ever formed.

Cir. 1991), the Second Circuit held that New York state law of corporate veil-piercing applied to determine whether, in a diversity action, the level of control by family members of a family-owned corporation was sufficient to impose liability upon them for the corporation's debts.

However, a critical distinction between Wm. Passalacqua and this case is that the former was a diversity action alleging breach of contract, to which New York state law would clearly apply,[13] whereas this case involves an attempt by plaintiffs to impose liability for unpaid ERISA obligations, a *federal* cause of action.  Although it does not appear that the Second Circuit has expressly addressed this issue, the weight of authority holds that federal common law, not state law, is applicable when assessing liability in ERISA actions.  See, e.g., Thomas v. Peacock, 39 F.3d 493, 503 (4th Cir. 1994) ("Because a rule of veil-piercing determines *who* is liable for breaches of ERISA fiduciary duties, we believe that ERISA preempts any state law of veil-piercing.") (emphasis in original), rev'd on other grounds, 516 U.S. 349 (1996); United Food & Commercial Workers Union v. Fleming Foods East, Inc., 105 F. Supp. 2d 379, 388 (D.N.J. 2000); ("[I]t is settled that federal law governs liability for breach of a labor contract between a union and employer, including liability based on a theory of corporate veil piercing."); I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc., 1991 WL 511071, at *3, Civ. A. No. 82-2187 , (D. D.C. 1991) ("In determining whether an individual has incurred such liability under ERISA, the Court is guided by a 'federal

---

[13]  The Second Circuit expressly made that point in the Wm Passalacqua decision.  See Wm. Passalacqua, 933 F.2d at 137 ("Because this is a diversity case, we apply the choice of law rules of the forum state, in this instance, New York.").

common law of veil piercing.'"); see also United States through Small Business Admin.

v. Pena, 731 F.2d 8, 12 (D.C. Cir. 1984); Seide Crest Color, Inc., 835 F.Supp. 732, 736

(S.D.N.Y. 1993) (finding that the Wm. Passalacqua decision does not apply to the

question of whether an entity is liable under ERISA); 1 William Meade Fletcher,

Fletcher Cyclopedia of the Law of Private Corporations, § 41.90 (Perm. Ed. 1999) ("In

disputes involving workers' claims to ERISA benefits, a federal court may apply a

federal common law standard of corporate separateness.").  Therefore, unless the

federal common law of corporate veil-piercing provides a basis for imposing liability

upon Professional, plaintiffs cannot succeed on their claim against that entity.

This Court's research has uncovered only two bases for piercing the

corporate veil under federal law to impose liability for pension contributions:  the alter

ego theory of liability, and the single employer theory of liability.  As previously noted,

the plaintiffs concede that Professional is not an alter ego of Installers or Equipment.

Nor have they argued that Professional and Equipment constitute a "single employer."[14]

Case law in the area of withdrawal liability also supports the conclusion

that Professional should not be held liable.  ERISA imposes withdrawal liability for

contributions only upon an "employer."  Although the statute does not specifically define

that term, a number of courts, including the Second Circuit, have determined that an

employer is one that is "obligated to contribute to a plan either as a direct employer or in

---

[14]  In Lihli Fashions, the Second Circuit explained that the "single employer" doctrine
requires a court to determine whether separate companies are "part of a single integrated
enterprise" by considering several factors, including the "interrelation of operations, common
management, centralized control of labor relations and common ownership."  Lihli Fashions, 80
F. 3d at 747 (internal quotations omitted).  Plaintiffs have not argued that the "single employer"
doctrine of Lihli Fashions applies here.

the interest of an employer of the plan's participants."  See Rheem Mfg. Co. v. Central States Southeast and Southwest Areas Pension Fund, 63 F.3d 703, 706 (8th Cir. 1995), cert. denied, 516 U.S. 1146 (1996); Korea Shipping Corp. v. New York Shipping Ass'n–Int'l Longshoreman's Ass'n Pension Fund,, 880 F.2d 1531, 1537 (2d Cir. 1989). The obligation arises from the contractual relationship between the employer and the union.  In this case, the contractual relationship was the collective bargaining agreement between Installers and the Union.  Equipment is liable only because it is an alter ego of Installers.  In other words, the Court has found that Equipment and Installers were essentially the same entity.

But the same cannot be said for Professional.  There is no allegation that Professional had anything to do with Installers so as to justify imposing Installers' withdrawal liability upon Professional.  Professional was not even incorporated until about three years after Installers became Equipment and several months after the collective bargaining agreement had expired.  Plaintiffs argue that Professional should be held liable because it is somehow responsible for the obligations of Equipment, the alter ego.  However, plaintiffs have failed to cite any cases (nor has this Court's research uncovered any cases) where an entity was held liable for the pension contributions of the alter ego.  In each of the cases cited by the plaintiffs, the entity or person held liable was either an alter ego itself, or a shareholder of that actual signatory.  Professional is neither.  It is not even a shareholder of the alter ego.  Under the facts of this case, the Court finds that Professional should not be held liable for pension contributions that arose under a collective bargaining agreement that expired before it was even formed.

21

## **CONCLUSION**

For the reasons stated, judgment is granted to plaintiffs on their claim for withdrawal liability against Equipment, as alter ego of Installers, but denied as to their claim against Professional.

IT IS SO ORDERED.

/s/ *Richard J. Arcara*

HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED: October 16, 2006